# Matter of D-R-, Respondent

*Decided April 6, 2011*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  The respondent's deliberate omission from his refugee application that he was a special police officer during the Bosnian War, during which time he served in an entity that was part of the Armed Forces of the Republic of Srpska, could have affected or influenced the Government's decision whether to grant him refugee status and was therefore a willful misrepresentation of a material fact.

(2)  The respondent is removable under section 237(a)(4)(D) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(4)(D) (2006), where the totality of the record supported the conclusion that he assisted in the extrajudicial killing of 200 Bosnian Muslims that his unit was involved in capturing, including evidence of his command responsibility, his presence, his platoon's active participation, and the finding that he must have been aware that many other Bosnian Muslims who were similarly situated had been executed nearby several days earlier.

(3)  An Immigration Judge may make reasonable inferences from direct and circumstantial evidence in the record as a whole and is not required to accept a respondent's account where other plausible views of the evidence are supported by the record.

(4)  An expert witness is broadly defined as one who is qualified as an expert by knowledge, skill, experience, training, or education and who has specialized knowledge that will assist the Immigration Judge to understand the evidence or to determine a fact in issue.

FOR RESPONDENT:  Richard A. Kulics, Esquire, Las Vegas, Nevada

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Charles W. Baccus, Assistant Chief Counsel

BEFORE:  Board Panel:  GRANT, MALPHRUS, and MULLANE, Board Members.

MALPHRUS, Board Member:

The respondent, a native and citizen of Bosnia and Herzegovina and lawful permanent resident of the United States, has appealed from a written decision of the Immigration Judge, dated November 24, 2009, finding the respondent removable based on conduct arising out of his service as a special police officer during the Bosnian War and ordering him removed from the United States to Bosnia and Herzegovina.  The Immigration Judge found that

the respondent's omission from his refugee application that he had served as a special police officer constituted a willful misrepresentation of a material fact, which rendered him removable under section 237(a)(1)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(1)(A) (2006), as an alien who was inadmissible at the time of entry under section 212(a)(6)(C)(i) of the Act, 8 U.S.C. § 1182(a)(6)(C)(i) (2006). The Immigration Judge also concluded that the Department of Homeland Security ("DHS") had proven by clear and convincing evidence that the respondent "assisted, or otherwise participated" in an extrajudicial killing and is therefore removable under section 237(a)(4)(D) of the Act. Consequently, the Immigration Judge ordered the respondent removed from the United States.

The respondent argues that his omission from the refugee application was not a material misrepresentation and that the Immigration Judge engaged in impermissible speculation to conclude that he assisted in an extrajudicial killing. He also argues that he was denied a fair hearing because counsel in the proceedings below did not object to the DHS's documentary evidence and testimony, and he makes other arguments that he claims warrant a remand or termination of proceedings. The DHS has filed a brief in opposition to the appeal. The appeal will be sustained in part and dismissed in part, and the record will be remanded for further proceedings.

We review the findings of fact made by the Immigration Judge to determine whether they are "clearly erroneous." 8 C.F.R. § 1003.1(d)(3)(i) (2010); *see also Matter of S-H-*, 23 I&N Dec. 462 (BIA 2002). We review de novo all questions of law, discretion, and judgment, including the question whether the parties have met the relevant burden of proof. 8 C.F.R. § 1003.1(d)(3)(ii); *see also Matter of H-L-H- & Z-Y-Z-*, 25 I&N Dec. 209 (BIA 2010).

## I. FACTUAL AND PROCEDURAL HISTORY

The Bosnian War was a civil conflict arising from the dissolution of the former Yugoslavia. It was fought from 1991 to 1995 between the ethnic Serb-dominated Republic of Srpska and the Federation of Bosnia-Herzegovina, which was dominated by Bosnian Muslims. Prior to the war, the respondent served as a police officer for 21 years in the Republic of Srpska, where he specialized in training dogs to search for drugs and criminals. During the civil war, consistent with the Republic of Srpska Constitution, the Republic of Srpska Ministry of Internal Affairs police force, known as the "MUP," became part of the Armed Forces of the Republic of Srpska.

During this time, the respondent was employed as a special police officer, and in the summer of 1995, he was assigned to the Special Police Brigade at the Ministry of Internal Affairs' Jahorina Training Center, which was overseen by Dusko Jevic. While there, the respondent served as the leader

of the third platoon in the 2nd Company of the Training Center, where about 25 special police officers served under his command.  His duties included being a dog training instructor and training police officers to secure or guard roads and regulate traffic.  The respondent's platoon and two others were under the command of Nedjo Ikonic.

One of the final major events of the war concerned what became known as the Srebrenica massacre, where, in July 1995, the Serbian forces took control of a United Nations safe area in eastern Bosnia and, over the course of 1 week, executed between 5,000 and 7,000 Bosnian Muslim men and boys. To prove its case, the DHS presented expert testimony and documents from the United Nations International Criminal Tribunal for the Former Yugoslavia at The Hague ("ICTY") and the Bosnian War Crimes Tribunal.

The documentary evidence, which the Immigration Judge found to be relevant and probative, included State Department reports, findings from ICTY trial judgments, and copies of real-time dispatch reports from field officers during the war that were seized by the ICTY after the war.  It also included a 5-minute video compiled by the prosecutor for the ICTY as part of the proceedings in the prosecution of Vidoje Blagojevic and Dragan Jokic and photographic images from a video taken by an independent Belgrade filmmaker, both of which primarily showed captured Bosnian Muslims along the Bratunac-Konjevic Polje road on July 13, 1995.  *See Prosecutor v. Vidoje Blagojević and Dragan Jokić*, Case No. IT-02-60-T, Trial Judgement (Int'l Crim. Trib. for the Former Yugoslavia Jan. 17, 2005), http://www.icty.org/x/cases/blagojevic_jokic/tjug/en/bla-050117e.pdf.

The record also included MUP records showing the respondent's service with the Special Police Brigade during the war.  Richard Butler, a criminal research specialist with the DHS who formerly worked as a military analyst for the ICTY, testified on military operations that occurred in Eastern Bosnia from 1992 to 1995, including those specifically related to the Srebrenica massacre. The Immigration Judge found his expert testimony to be credible and persuasive.

The testimony and evidence showed that as the Serbian Army overtook Srebrenica and Bosnian Muslims fled the area, thousands were executed. *See, e.g.*, *Prosecutor v. Radislav Kristic*, Case No. IT-98-33-T, Trial Judgement (Int'l Crim. Trib. for the Former Yugoslavia Aug. 2, 2001), http://www.icty.org/x/cases/krstic/tjug/en/krs-tj010802e.pdf [hereinafter ICTY Kristic Trial Judgement] ("As thousands of them attempted to flee the area, they were taken prisoner, detained in brutal conditions and then executed."). Butler testified that when the Serbian Army overtook Srebrenica, the Commander of the Jahorina Training Center received an urgent message to secure the Bratunac-Konjevic Polje road between Konjevic Polje and the village of Kravika, a key escape route through the rugged mountainous terrain for fleeing Bosnian Muslims.  Butler explained that the respondent's platoon,

along with others from the Training Center, arrived on the road on July 12 and stayed until at least July 19. During that week, they did not leave the area and even slept outdoors.

While there, the respondent's platoon and others secured or guarded segments of the road and conducted joint "sweep" operations with Army troops and other special police in the surrounding mountainous area to secure the road and nearby area from escaping Bosnian Muslims. Butler's testimony referenced a real-time field report in evidence, which stated that "two MUP companies [including] part of the forces for the Dog Breeding and Training Center [led by the respondent] have sealed off the area and are fighting the remaining Muslim forces from Srebrenica." Butler also testified that between July 12 and July 18, 1995, many Bosnian Muslims surrendered or were captured along various segments of this road and that field communications showed that the MUP were almost entirely responsible for securing the road.

On the morning of July 13, 1995, a total of about 1,000 Bosnian Muslim men and boys (as young as age 15) surrendered on different points of the Bratunac-Konjevic Polje road, including in the area of Sandici-Novici, which is the area of the road where the respondent testified that he and his platoon were stationed. Evidence showed Bosnian Muslims being induced to come out of the rough terrain by promises of food and water and humane treatment. Those who surrendered were taken to a warehouse in the village of Kravica, traveling in a convoy of dozens of trucks and buses on the Bratunac-Konjevic Polje road that the respondent and his men helped patrol. At the warehouse, which was less than 2 miles from the respondent's position on the road, MUPs shot and killed approximately 1,000 men and boys within 2 hours. Butler testified that they were then buried in mass graves.

On July 16 or 17, the 2nd Company Special Police Brigade under Ikonic's command, which included the respondent's platoon as well as two Army units from the Bratunac Brigade, were involved in a joint sweep operation that resulted in the capture of about 200 Bosnian Muslim men and boys and four young children along the Bratunac-Konjevic Polje road.

Jevic, the commander of the Training Center where the 2nd Company Special Police Brigade was based, testified on behalf of the respondent by televideo. According to his own testimony, Jevic was responsible for having the men loaded onto the buses. Those under Jevic's command, including the respondent's platoon, loaded the men onto buses before they were driven away. Jevic said that it was his understanding that the men were to be taken to Zvornik and that he could not have known what would happen to them. Jevic also stated that he never ordered these or any other captured Bosnian Muslims to be killed. Furthermore, he said he had no knowledge that anyone under his command, including the respondent, ordered these or any other captured men to be killed.

It is undisputed that none of the 200 who were captured were ever heard from again.[1] According to Butler's testimony, they were apparently killed unlawfully, probably in a manner similar to the men at the Kravica warehouse. Butler also testified that it was well known by the time these 200 were captured that mass executions of Bosnian Muslims were taking place.

Four years later, in June 1999, the respondent was admitted to the United States as a refugee, and he subsequently adjusted his status to that of a lawful permanent resident in January 2002. The respondent omitted from his application for refugee status that he served as a special police officer in the Republic of Srpska during the Bosnian War.[2] He testified that he omitted this information because an International Organization for Migration ("IOM") agent who assisted him in completing his application told him that he would be disqualified for refugee status if he revealed his former employment as a police officer. The respondent argues that the evidence does not establish that this omission constitutes a willful misrepresentation of a material fact under section 237(a)(1)(A) of the Act.

In addition, the respondent asserts that the Immigration Judge engaged in improper speculation to conclude that he "assisted, or otherwise participated" in an extrajudicial killing and is therefore removable under section 237(a)(4)(D) of the Act. The respondent does not dispute that he was present at the time the 200 men, all of whom he said were adult soldiers, surrendered to the police and military units that were there at the time, and he said that the Army took them away on the buses. He said that he did not know where the men were being taken or what would happen to them. He also denied ever hearing about the Kravica warehouse killings or any other mass executions of Bosnian Muslims while he served in the special police during the war.

---

[1] The four children captured along with the others were taken elsewhere and were not harmed.

[2] In response to the question regarding his employment on the refugee application Biographic Information sheet (Form G-325C), which he signed in September 1998, the respondent indicated that from May 1992 to the present, he was "unemployed (part time jobs)." Moreover, on his refugee application, the Form I-590 (Registration for Classification as Refugee), which he signed in October 1999, the respondent indicated that his military service was only as a private in a Yugoslavian guard unit from 1970 to 1971. Later, when completing his application for permanent residence, the respondent answered "none" to the question about military service on the Form I-485 (Application to Register Permanent Resident or Adjust Status), although the Immigration Judge did not address any issue of misrepresentations on that application.

## II. ANALYSIS

### A. Material Misrepresentation

We agree with the Immigration Judge that the respondent's omission from his application for refugee status that he served as a special police officer in the Republic of Srpska constitutes a willful misrepresentation of a material fact, which renders him removable under section 237(a)(1)(A) of the Act as an alien who was inadmissible at the time of entry. Section 212(a)(6)(C)(i) of the Act renders inadmissible any alien who, "by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this Act." The test for whether "concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the Immigration and Naturalization Service." *Kungys v. United States*, 485 U.S. 759, 772 (1988); *see also Mwongera v. INS*, 187 F.3d 323, 330 (3d Cir. 1999) (citing *Matter of Kai Hing Hui*, 15 I&N Dec. 288, 289 (BIA 1975)); *Matter of Bosuego*, 17 I&N Dec. 125, 130 (BIA 1979, 1980) (stating that a misrepresentation is material if it "tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded"). It is not necessary for the Government to show that the statement actually influenced the agency, only that the misrepresentation was capable of affecting or influencing the governmental decision. *United States v. Matsumaru*, 244 F.3d 1092, 1101 (9th Cir. 2001).

The respondent admits that he failed to disclose his former employment as a police officer during the Bosnian War on his refugee application but argues that it was not a material misrepresentation. We do not agree.

Todd Gardner, a Special Assistant with the Refugee Affairs Division of the United States Citizenship and Immigration Services, who is also an attorney and an expert in refugee processing, testified that failure to disclose police and military service during the Bosnian War would have prevented an appropriate line of inquiry regarding whether the applicant was barred from refugee status as a persecutor. He said that including this information would have prompted further questioning because of the human rights abuses that occurred during the war, although it would not have caused an automatic rejection of an application.

Contrary to the respondent's argument, the DHS does not need to establish that but for the misrepresentation, the respondent would have been denied refugee status. *See United States v. Matsumaru*, 244 F.3d at 1101; *see also, e.g.*, *Ali v. U.S. Att'y Gen.*, 443 F.3d 804, 812-13 (11th Cir. 2006). The respondent's deliberate omission from his refugee application that he was a special police officer in the Republic of Srpska during the Bosnian War

could have influenced the Government's decision whether to grant him refugee status. Accordingly, the respondent's concealment constitutes a willful misrepresentation of a material fact, which renders him removable under section 237(a)(1)(A) of the Act.[3]

## B. Extrajudicial Killing

We also agree with the Immigration Judge's conclusion that the DHS has proven by clear and convincing evidence that the respondent "committed, ordered, incited, assisted, or otherwise participated" in an extrajudicial killing and therefore is removable under section 237(a)(4)(D) of the Act. This section cross-references section 212(a)(3)(E), which was amended by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 ("IRTPA"), to make aliens who have committed torture or extrajudicial killings inadmissible to, and removable from, the United States.[4] Specifically, section 5501(a) of the IRTPA, 118 Stat. at 3740, amended section 212(a)(3)(E) of the Act by adding the following provision:

> (iii) Commission of Acts of Torture or Extrajudicial Killings
>
> Any alien who, outside the United States, has committed, ordered, incited, assisted, or otherwise participated in the commission of—
>     (I) any act of torture, as defined in section 2340 of title 18, United States Code; or
>     (II) under color of law of any foreign nation, any extrajudicial killing, as defined in section 3(a) of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note), is inadmissible.[5]

---

[3] To the extent the respondent implies that his failure to disclose his service as a police officer should be excused based on the advice he claimed to have received from the IOM officer who assisted him in completing his application, we do not agree. "'The element of willfulness is satisfied by a finding that the misrepresentation was deliberate and voluntary.' The INS does not need to show intent to deceive; rather, knowledge of the falsity of the representation will suffice." *Mwongera v. INS*, 187 F.3d at 330 (quoting *Witter v. INS*, 113 F.3d 549, 554 (5th Cir 1997)); *see also Espinoza-Espinoza v. INS*, 554 F.2d 921, 925 (9th Cir. 1977). The respondent does not dispute that his failure to disclose the information was intentional. We therefore conclude that the willfulness element has been met.

[4] Section 237(a)(4)(D) of the Act was also amended by section 5501(b) of the IRTPA, 118 Stat. at 3740.

[5] According to 28 U.S.C. § 1350(3)(a) (2006), the term "extrajudicial killing" means "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."

To determine whether the respondent is subject to removability under section 237(a)(4)(D) of the Act, the DHS must establish that he acted "under color of law" and that he "committed, ordered, incited, assisted, or otherwise participated" in the commission of an extrajudicial killing. The respondent's actions during this period were clearly under color of law. His service with the Jahorina Training Center Special Police Brigade in 1995 was under the authority of the commander of the Center, and under the Constitution of the Republic of Srpska, the special police answered to the military command during wartime. However, even if he had been a police officer who was not under the control of the military in 1995, for purposes of this statute, he would have been acting under the color of law in his employment as a police officer for the Republic of Srpska.

The respondent challenges the Immigration Judge's determination that the DHS proved by clear and convincing evidence that he "ordered, incited, assisted, or otherwise participated" in an extrajudicial killing. While the Act does not define the phrase "ordered, incited, assisted, or otherwise participated," the Attorney General has interpreted this phrase in the context of the persecutor bar, saying that "[t]he plain meaning of the relevant words in the statute is broad enough to encompass aid and support provided by a political leader to those who carry out the goals of his group, including statements of incitement or encouragement and actions that result in advancing the violent activities of the group." *Matter of A-H-*, 23 I&N Dec. 774, 784 (A.G. 2005). The terms "are to be given broad application" and "do not require direct personal involvement in the acts of persecution." *Id.* "It is appropriate to look at the totality of the relevant conduct in determining whether the bar to eligibility applies." *Id.* at 785.

The United States Senate Report for the proposed Anti-Atrocity Alien Deportation Act of 2003, S.710, 108th Cong. (2003), explains the role of command authority as a form of assistance or participation in persecution and indicates the intended broad reach of the legislation. S. Rep. No. 108-209, at 10, 2003 WL 22846178, at *10 (Leg. Hist.). The Anti-Atrocity Alien Deportation Act of 2003 was not passed as separate legislation, but the statutory language from this bill was incorporated into the IRTPA, which was enacted into law. The report states that the proposed act was "intended to close loopholes in U.S. immigration laws that have allowed aliens who have committed serious forms of human rights abuses abroad to enter and remain in the country." *Id.* at 1-2, 2003 WL 22846178, at *1-2. It further provides as follows:

> The statutory language—"committed, ordered, incited, assisted, or otherwise participated in"—is intended to reach the behavior of persons directly or personally associated with the covered acts, including those with command responsibility. Command responsibility holds a commander responsible for unlawful acts when (1) the forces who committed the abuses were subordinates of the commander (i.e.,

> the forces were under his control either as a matter of law or as a matter of fact); (2) the commander knew, or, in light of the circumstances at the time, should have known, that subordinates had committed, were committing, or were about to commit unlawful acts; and (3) the commander failed to prove that he had taken the necessary and reasonable measures to (a) prevent or stop subordinates from committing such acts, or (b) investigate the acts committed by subordinates in a genuine effort to punish the perpetrators. Attempts and conspiracies to commit these crimes are encompassed in the "otherwise participated in" language. This language addresses an appropriate range of levels of complicity for which aliens should be held accountable, and has been the subject of extensive judicial interpretation and construction. *See Fedorenko v. United States*, 449 U.S. 490, 514 (1981); *Kalejs v. INS*, 10 F.3d 441, 444 (7th Cir. 1993); *U.S. v. Schmidt*, 923 F.2d 1253, 1257–59 (7th Cir. 1991); *Kulle v. INS*, 825 F.2d 1188, 1192 (7th Cir. 1987).

*Id.* at 10, 2003 WL 22846178, at *10.

The cases cited in this provision indicate that there is a continuum of conduct ranging from passive acceptance, which does not meet the legal standard, to active, personal participation, which clearly does. *See United States v. Schmidt*, 923 F.2d at 1258 (citing *Fedorenko v. United States*, 449 U.S. at 512 n.34). *See generally Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 213-14 (BIA 2007) (discussing the particular significance of cases that Congress cited with approval in legislative history). These cited cases also make clear that one can be found to have "assisted" in persecution even if he has not "personally engaged in acts of violence." *Id.*; *see also Kalejs v. INS*, 10 F.3d at 444 (stating that "assistance" in persecution is an independent basis for deportation, which "may be inferred from the general nature of the person's role in the war, so the atrocities committed by a unit may be attributed to the individual based on his membership and seeming participation"). In light of this legislative history, we conclude that inadmissibility under section 212(a)(3)(E) of the Act is established where it is shown that an alien with command responsibility knew or should have known that his subordinates committed unlawful acts covered by the statute and failed to prove that he took reasonable measures to prevent or stop such acts or investigate in a genuine effort to punish the perpetrators.

The Immigration Judge made reasonable inferences from the totality of the record to conclude that the respondent assisted in the commission of extrajudicial killings because he knew that the 200 Bosnian Muslims would be killed unlawfully, and even if he did not, he should have known that they would. We find no clear error in these factual findings. *See Matter of J-B-N- & S-M-*, 24 I&N Dec. at 215 (finding no clear error in the Immigration Judge's fact-finding as to the persecutors' motive); *Matter of S-P-*, 21 I&N Dec. 486, 489-90 (BIA 1996) (noting that the motivation of the persecutor involves questions of fact).

The respondent argues that he did not know what would happen to the 200 captured Bosnian Muslims and that the Immigration Judge's conclusions to the

contrary were speculative. However, the Immigration Judge's findings were based on reasonable inferences from direct and circumstantial evidence of the record as a whole, not on speculation. It is clear that "rank speculation and conjecture 'cannot be substituted for objective and substantial evidence.'" *Nuru v. Gonzales*, 404 F.3d 1207, 1226 (9th Cir. 2005) (quoting *Bandari v. INS*, 227 F.3d 1160, 1167 (9th Cir. 2000)); *see also Salaam v. INS*, 229 F.3d 1234, 1238 (9th Cir. 2000) (noting that factual findings cannot be based on an "unsupported assumption"). However, an "inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks and brackets omitted)). An inference is not impermissible as long as it is supported by "record facts, or even a single fact, viewed in the light of common sense and ordinary experience." *Id.* at 169. "Drawing inferences from direct and circumstantial evidence is a routine and necessary task of any factfinder," and "[i]n the immigration context, the IJ is the factfinder." *Id.* at 167.

The Immigration Judge reasonably found, based on the testimony and evidence, that the respondent was aware of the Kravica warehouse killings before his unit was involved in capturing the 200 men and boys in question several days later. For example, the ICTY Krstic Trial Judgment, which was introduced as evidence in these proceedings, concluded that the Drina Corps Command "must have been well aware of the fact that the executions had taken place at the Kravica Warehouse" by the evening of July 13, 1995, given their proximity to the area and the noise and high levels of activity associated with the massive scale of the executions. ICTY Krstic Trial Judgment, *supra*, at ¶ 215. Butler indicated that it was implausible that the respondent would not have heard the mass executions, based on his close proximity to the Kravika warehouse. Moreover, an International Warrant for the respondent's arrest issued by the Court of Bosnia and Herzegovina, which was also admitted into evidence, states that the respondent "knew that his subordinates took part in the execution of detainees at Kravica."

Given that the respondent must have been aware of the Kravica warehouse killings, it was also reasonable for the Immigration Judge to infer that the respondent assisted in the unlawful killing of the 200 Bosnian Muslims that his unit was involved in capturing on the same stretch of road a few days later because he knew or should have known that they would face a similar fate. As Butler testified, it was well known at this time that Serbians were committing mass killings of Bosnian Muslims. While there is no evidence that the respondent ordered any extrajudicial killing, the totality of the record supports the conclusion that he assisted in such killing. This includes his command responsibility, his presence, his platoon's active participation, and the finding that he must have been aware that mass killings of other similarly

situated Bosnian Muslims were ongoing at this time, particularly the nearby mass execution at the Kravica warehouse several days earlier.

The Immigration Judge was not required to credit the respondent's wholesale denial of any knowledge or culpability related to the mass executions of Bosnian Muslims captured on the Bratunac-Konjevic Polje road.[6] She did not commit clear error in crediting the version of events that the DHS presented through expert testimony and documentary evidence. An Immigration Judge is not required to accept a respondent's assertions, even if plausible, where there are other permissible views of the evidence based on the record. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *see also Blanco v. Mukasey*, 518 F.3d 714, 721 (9th Cir. 2008) (finding that it was not error for the Immigration Judge to reject the applicant's plausible account of the circumstances based on contrary evidence); *Don v. Gonzales*, 476 F.3d 738, 744 (9th Cir. 2007) (stating that the Immigration Judge is not required to interpret the evidence in the manner advocated by the applicant).

The Immigration Judge reasonably rejected the respondent's claims of "ignorance" about the circumstances, finding that his testimony "was contradicted on multiple occasions by the testimony of other witnesses and the documents." For example, the respondent testified that he was not aware of any mass executions taking place while he was involved in guarding and patrolling the Bratunac-Konjevic Polje road and claimed that he had never heard of the Kravica warehouse killings. However, Butler testified that it was not plausible that the respondent would have been unaware of the Kravica warehouse killings at the time they happened. The respondent claimed that he and his men were stationed on the road for only 3 or 4 days on dates that he could not remember, while Butler testified that they were there from July 12 until at least July 19.

The respondent also claimed his platoon's only interaction with Bosnian Muslims was upon the surrender of the 100 to 200 men, that he never saw buses travel along the road other than the three buses for these men, and that when his platoon was involved in joint sweep operations, they were not looking for "anything specific." However, Butler testified that there was much traffic on the road during this period, including on July 12 and 13 when thousands of women and children who had been taken out of Srebrenica after

---

[6] The respondent testified that when he saw Bosnian Muslims surrender on the road, "they would take off their weapons and put them together, and on the other side, [would put their] documents" before they were taken away in buses. Butler testified in a different context that, in general, the separation of Bosnian Muslims from their identity documents was common and was an indication that they would be executed.

being separated from men and boys were transported along this road in dozens of convoys of buses. In addition, Jevic testified in a transcribed interview for the ICTY, which was included in the record in this case, that the respondent's platoon encountered dead Bosnian Muslims while conducting sweep operations along the Bratunac-Konjevic Polje road on July 16 and 17.[7] Jevic also indicated that the purpose of the sweep operations was to find escaping Bosnian Muslims.

The need for a fact-finder to consider both direct and circumstantial evidence in the persecutor bar context is well established. *See, e.g.*, *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) (holding that persecutors' motives may be established by direct or circumstantial evidence). It is often the case that there is not direct evidence that the respondent persecuted anyone, in part because of the lack of victim witnesses. *See Kalejs v. INS*, 10 F.3d at 444. The fact-finding in the persecutor bar context is analogous to the fact-finding in the context of extrajudicial killing. Also, contrary to the respondent's assertions, the evidence here establishes more than a simple case of men dying incident to the military objectives inherent in a civil war. Instead, many men and boys who surrendered, often under the guise of humane treatment, were captured and later executed. Moreover, the respondent does not claim to have even asked what happened to the 200 who surrendered to his unit and others, at that time or any later time.

Given the testimony and evidence as a whole, the Immigration Judge made reasonable inferences from the record to conclude that the respondent knew or should have known that the 200 men and boys would be unlawfully killed. Consequently, the DHS met its burden to establish that the respondent is removable under section 237(a)(4)(D) of the Act.

The respondent alternatively argues that the application of this ground of removability to him would be impermissibly retroactive. It is true that the conduct in dispute occurred in 1995, years prior to the enactment of the IRTPA in 2004. However, the IRTPA provides that the amendments to sections 212(a)(3)(E) and 237(a)(4)(D) of the Act shall apply to "offenses committed before, on, or after the date of enactment" of the IRTPA. IRTPA § 5501(c), 118 Stat. at 3740. Thus, his argument is inconsistent with the plain language of the statute. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006). In any event, "neither the Immigration Judge nor this Board may rule on the constitutionality of the statutes that we administer." *Matter of Rodriguez-Carrillo*, 22 I&N Dec. 1031, 1035 (BIA 1999).

---

[7] When he testified in the respondent's case, Jevic said that his testimony before the ICTY was accurate.

### C.  Documentary Evidence and Expert Testimony

The respondent alternatively argues that the documentary evidence and expert testimony that the Immigration Judge relied on to conclude that he assisted in extrajudicial killings was "obviously inadmissible and unreliable evidence." Even though his prior counsel eventually stipulated at the hearing that he had no objection to the admissibility of any of the Government's evidence, the respondent asserts that the attorney's failure to object to this evidence constituted ineffective assistance of counsel, deprived him of due process, and warrants a remand.

First, the respondent's failure to object to the admission of the evidence before the Immigration Judge constituted a waiver, and the issue was not preserved for our review on appeal. *See Matter of J-Y-C-*, 24 I&N Dec. 260, 261 n.1 (BIA 2007); *Matter of Garcia-Reyes*, 19 I&N Dec. 830, 832 (BIA 1988); *see also, e.g.*, *Torres de la Cruz v. Maurer*, 483 F.3d 1013, 1022-23 (10th Cir. 2007). It appears that after initially making some evidentiary objections, counsel below made a tactical decision to focus his arguments on the sufficiency of the evidence to establish whether the respondent was involved in an extrajudicial killing, given his denials. *See Matter of Gawaran*, 20 I&N Dec. 938, 942 (BIA 1995) (noting that "in the absence of egregious circumstances, an alien is bound by the 'reasonable tactical actions' of . . . counsel" (quoting *Matter of Velasquez*, 19 I&N Dec. 377, 383 (BIA 1986)).

As a general rule, to prevail on an ineffective assistance of counsel claim, the respondent must satisfy the requirements set forth in *Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988), *aff'd*, 857 F.2d 10 (1st Cir. 1988). In addition to substantially complying with these requirements, the respondent must also show prejudice as a result of his attorney's ineffectiveness. *Id*. at 640. In the United States Court of Appeals for the Ninth Circuit, in whose jurisdiction this case arises, prejudice exists when the performance of counsel is so inadequate that there is a reasonable probability that but for the attorney's negligence, the outcome of the proceedings may have been different. *See Maravilla Maravilla v. Ashcroft*, 381 F.3d 855, 858 (9th Cir. 2004). "To prevail, the respondent[] must show that the conduct of former counsel was so egregious that it rendered [the] hearing unfair." *Matter of B-B-*, 22 I&N Dec. 309, 311 (BIA 1998).

The Ninth Circuit has held that an alien need not strictly comply with all the procedural requirements of *Matter of Lozada* when the record reflects a "clear and obvious case of ineffective assistance of counsel." *Castillo-Perez v. INS*, 212 F.3d 518, 526 (9th Cir. 2000); *see also Ray v. Gonzales*, 439 F.3d 582, 588 (9th Cir. 2006).[8] The respondent, through new counsel on appeal,

---

[8]  We do not intend to suggest that this exception to the *Lozada* requirements should be applied outside of this circuit.

seeks to invoke this exception because he has not fulfilled the requirements of *Lozada*, including affording prior counsel an opportunity to respond to the allegations and filing a complaint with the appropriate disciplinary authorities. We do not agree that ineffective assistance of prior counsel was clear and obvious in this case.

In immigration proceedings, the "sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair." *Espinoza v. INS*, 45 F.3d 308, 310 (9th Cir. 1995); *see also, e.g.*, *Nyama v. Ashcroft*, 357 F.3d 812, 816 (8th Cir. 2004); *Matter of DeVera*, 16 I&N Dec. 266, 268-69 (BIA 1977). It is well settled that the Federal Rules of Evidence are not binding in immigration proceedings and that Immigration Judges have broad discretion to admit and consider relevant and probative evidence. *Matter of Interiano-Rosa*, 25 I&N Dec. 264, 265 (BIA 2010); *Matter of DeVera*, 16 I&N Dec. at 268; *see also* section 240(b)(1) of the Act, 8 U.S.C. § 1229a(b)(1) (2006); *Navarrette-Navarrette v. Landon*, 223 F.2d 234, 237 (9th Cir. 1955) (stating that "administrative tribunals may receive evidence which a court would regard as legally insufficient").[9]

The respondent argues that the DHS's documentary evidence was inherently unreliable because it was not authenticated and there was no proper chain of custody.[10] In the Ninth Circuit, official records and public documents from foreign governments may be authenticated either through the requirements of 8 C.F.R. § 1287.6 (2010) or through any recognized procedure, including the Federal Rules of Evidence. *Vatyan v. Mukasey*, 508 F.3d 1179, 1182-83 (9th Cir. 2007). The method of authentication that the party submitting the evidence utilizes may affect the weight of the evidence, and Immigration Judges "retain broad discretion to accept a document as authentic or not based on the particular factual showing presented."

---

[9] The Federal Rules of Evidence, while not binding, may provide helpful guidance in immigration proceedings because the fact that specific evidence would be admissible under the Federal Rules "lends strong support to the conclusion that admission of the evidence comports with due process." *Felzcerek v. INS*, 75 F.3d 112, 116 (2d Cir. 1996); *see also, e.g.*, *Malkandi v. Holder*, 576 F.3d 906, 916 (9th Cir. 2009) (noting that while strict rules of evidence do not apply in immigration proceedings, the report in question would have been admissible under the Federal Rules); *Matter of DeVera*, 16 I&N Dec. at 270-71 (finding that a document was properly given full weight where its reliability was ensured because it fell within an express hearsay exception under the Federal Rules of Evidence).

[10] The respondent also argues that he is not fluent in English, so the DHS's documentary evidence was inadmissible because it had not been translated into his native language. However, no such requirement exists in immigration proceedings. *Cf.* 8 C.F.R. § 1003.33 (2010) (providing that any foreign language document must be translated into English to be admissible in Immigration Court). In any event, the respondent used a court-provided interpreter at the hearing.

*Id*. at 1185. Under the Federal Rules of Evidence, authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims," and may be accomplished through testimony of a "witness with knowledge." *See* Fed. R. Evid. 901(a)–(b)(1).

In this case, Butler testified specifically about how the ICTY seized records from the archives of military and police installations, noting his own participation in some investigative search teams and operations. He also discussed the ICTY certification process for court proceedings, including how documents were identified, catalogued, and stored. While he was not involved in seizing or storing specific documents entered into evidence in this case, he recognized the indexing and control numbers that were placed on them in the certification process. He specifically discussed various documents in evidence, including MUP records of the respondent's service during the war, ICTY trial judgments, the International Arrest Warrant, the video, and photographic images from the video footage.[11] In *United States v. Vidacak*, 553 F.3d 344 (4th Cir. 2009), which involved a criminal prosecution in Federal district court for false statements related to immigration documents arising out of the Bosnian War, the Fourth Circuit upheld the admission of some similar evidence based on testimony by Butler.[12] Also, as the *Vidacak* court discussed, issues regarding authentication and chain of custody generally go to the weight of the evidence, not its admissibility. *Id.* at 350 (citing *United States v. Cardenas*, 864 F.3d 1528, 1531 (10th Cir. 1989)).

The respondent also argues that his counsel should have objected to Butler's qualifications as an expert witness and alleges that Butler's testimony should have been deemed inadmissible hearsay. We do not agree. An expert witness is broadly defined as someone who is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994). An expert has "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Matter of Marcal Neto*, 25 I&N Dec. 169, 176 (BIA 2010) (stating that Immigration Judges may rely on experts "regarding matters on which they possess little or no knowledge or substantive expertise"). Butler was clearly qualified to testify as an expert on military operations during the Bosnian War. Butler worked for 7 years with

---

[11] One of the DHS exhibits contained a certificate of authenticity from the ICTY and a written declaration signed by the custodian of the records, which would have established the admissibility of this document without testimony.

[12] While Butler did not separately reference every piece of evidence the DHS submitted, the respondent's attorney later withdrew his objections to any of the DHS's evidence, making further explanation of specific documents unnecessary.

the ICTY as a military analyst, specifically assisted in war crimes prosecutions, is a retired U.S. Army intelligence officer, and previously testified as an expert on the Srebrenica massacre before the ICTY at the Hague, the Bosnian War Crimes Court, and Federal courts in the United States.[13] *See, e.g.*, *United States v. Vidacak*, 553 F.3d at 347-49.

Further, since Butler was an expert witness, his testimony would not constitute inadmissible hearsay, even under the Federal Rules. "An expert is permitted to base his opinion on hearsay evidence and need not have personal knowledge of the facts underlying his opinion." *Aguilar-Ramos v. Holder*, 594 F.3d 701, 706 n.7 (9th Cir. 2010). Also, an expert opinion may include reasonable inferences that the expert draws from the available facts and data. *See* Fed. R. Evid. 703. Thus, Butler's testimony was not inadmissible, and it was proper for him to testify as to his inferences from the facts in evidence.[14] Also, his testimony was clearly adequate to support the admission of the DHS's evidence in Immigration Court.[15]

Moreover, to the extent that any of the DHS's testimonial or documentary evidence, such as the transcript of Jevic's testimony at the ICTY, could have

---

[13] An Immigration Judge who finds an expert witness qualified to testify may give different weight to the testimony, depending on the extent of the expert's qualifications or based on other issues regarding the relevance, reliability, and overall probative value of the testimony as to the specific facts in issue in the case. For example, the fact that Butler was employed by the DHS and had worked for the prosecutor at the ICTY could have affected the weight that the Immigration Judge chose to give to his testimony, but it would not have made the testimony inadmissible. *See Tun v. Gonzales*, 485 F.3d 1014, 1027 (8th Cir. 2007) (stating that involvement in an advocacy organization may affect the weight of an expert's testimony but is not an adequate basis to exclude it); *see also Akinfolarin v. Gonzales*, 423 F.3d 39, 43 (1st Cir. 2005) (noting that the reasons that an expert's affidavit was found to lack reliability, which were held to be sufficient to exclude the evidence, could have alternatively been applied to lessen the weight the evidence was given after admitting it). *See generally* Fed.R.Evid. 702 (discussing relevance of the expert testimony, qualifications of the expert witness, and reliability of the expert opinion).

[14] The Fourth Circuit has held that the foreign government documents that Butler testified about in the Federal court case were not inadmissible hearsay because they fell within the hearsay exception of Rule 803(8) of the Federal Rules of Evidence, which concerns records and reports of public agencies. *United States v. Vidacak*, 553 F.3d at 351.

[15] The respondent also argues that Gardner, who testified regarding the respondent's omission on his refugee application, should not have been permitted to testify because he did not process the respondent's application and had no knowledge of the respondent's case, other than reviewing his refugee application at the hearing. However, as a United States Government official with significant experience in refugee processing, Gardner was qualified to testify as an expert and to give an opinion as to whether certain facts, if known, would have influenced the Government's decision whether to grant the application. *See United States v. Matsumaru*, 244 F.3d at 1101-02.

constituted inadmissible hearsay in Federal court, this fact alone would not make the evidence inadmissible in immigration proceedings. Hearsay is admissible in immigration proceedings if it is reliable and probative. *See, e.g.*, *Kim v. Holder*, 560 F.3d 833, 836 (8th Cir. 2009); *Matter of Grijalva*, 19 I&N Dec. 713, 722 (BIA 1988); *see also Duad v. United States*, 556 F.3d 592, 596 (7th Cir. 2009) (noting that any rule prohibiting hearsay evidence in immigration proceedings would be very detrimental to many asylum seekers). However, the hearsay nature may affect the weight of the evidence. *See, e.g.*, *Gu v. Gonzales*, 454 F.3d 1014, 1021 (9th Cir. 2006); *Chen v. Gonzales*, 434 F.3d 212, 218 (3d Cir. 2005); *Matter of Kwan*, 14 I&N Dec. 175, 177 (BIA 1972).

The Immigration Judge found the evidence presented by the DHS to be relevant and probative, and she properly considered it in making her factual findings. We do not agree that this is a case which involves clear and obvious ineffective assistance resulting from prior counsel's failure to object to that evidence. Accordingly, we find no merit to the respondent's arguments in this regard.

## D. Interpretation Issues

The respondent next generally challenges the competency of the interpreter and properly notes that "a competent translation is fundamental to a full and fair hearing." *Perez-Lastor v. INS*, 208 F.3d 773, 778 (9th Cir. 2000); *see also Matter of Tomas*, 19 I&N Dec. 464, 465 (BIA 1987). In such a challenge, the respondent must show both that the interpreter did not perform competently and that his hearing was prejudiced by that failure. *Hartooni v. INS*, 21 F.3d 336, 339-40 (9th Cir. 1994). The respondent has not met either requirement here.

On appeal, the respondent quotes some passages of imperfect English that he assumes are based on inaccurate translations and a few examples of confusion in the transcript, such as where the interpreter asked the witness to repeat some of his answers and to shorten them to allow her to interpret them verbatim. However, the respondent has not cited specific examples of material testimony that was not translated or was translated incorrectly. In general, interpretations are more challenging when a witness is testifying by televideo, as was the case here. An interpreter asking for clarification or making a correction to an interpretation does not necessarily show that the interpretation was inadequate and may instead indicate an effort to be as accurate as possible.

Moreover, the respondent has not shown how "a better translation would have made any difference in the hearing's outcome." *Singh v. Ashcroft*, 367 F.3d 1139, 1144 (9th Cir. 2004). The respondent has not identified where the Immigration Judge relied on incomplete or incorrectly translated testimony

in reaching her decision, and he has not shown that the outcome would have been any different, particularly given the Immigration Judge's finding that the DHS's evidence met the Government's burden in this case.

### E.  Termination of Removal Proceedings

The respondent also seeks termination of the proceedings, arguing that the Immigration Judge lacked jurisdiction to address the issues in this case and that even if she did, the proceedings should be barred, because the respondent had been granted lawful permanent resident status more than 5 years prior to the commencement of these proceedings in March 2008.

The respondent's contention that many of the underlying issues in this case involve international law and war crimes, over which the Immigration Court does not have jurisdiction or competency, is wholly without merit.  Contrary to the respondent's assertions, these are civil immigration proceedings whose purpose is to determine his eligibility to remain in this country, not to punish him for criminal or other conduct in his home country.  *See generally INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) (noting that the purpose of deportation or removal proceedings is not to punish past transgressions and that "[p]ast conduct is relevant only insofar as it may shed light on the respondent's right to remain" in the United States).

As discussed above, it is the respondent who chose to apply for and obtain refugee status in the United States and who was not truthful in the representations he made in that regard.  The gravamen of these proceedings concerns whether he is entitled to maintain the privilege of the lawful permanent resident status that he later received in the United States.  The Immigration Court clearly has the legal authority to adjudicate these matters. *See* section 240(b)(1) of the Act; 8 C.F.R. §§ 1003.10(b), 1240.1(a)(1) (2010).

We also do not agree that these proceedings are barred by a statute of limitations to revoke a grant of lawful permanent resident status.  To revoke a grant of adjustment of status, the DHS can commence either rescission proceedings under section 246(a) of the Act, 8 U.S.C. § 1256(a) (2006), or removal proceedings under section 240.  *See Biggs v. INS*, 55 F.3d 1398, 1401 (9th Cir. 1995).  Rescission proceedings must be instituted within 5 years of the alien's adjustment of status.  *See* section 246(a) of the Act.  However, the Act places no such time restriction on removal proceedings, which can be instituted at any time.  *See Biggs v. INS*, 55 F.3d at 1401 & n.3.

Contrary to the respondent's assertions, the DHS had authority to initiate these removal proceedings, and a 5-year statute of limitations is not applicable. *See Matter of Belenzo*, 17 I&N Dec. 374 (BIA 1981).  The respondent urges us to change our interpretation in light of *Garcia v. Attorney General of the United States*, 553 F.3d 724 (3d Cir. 2009), which held that a 5-year statute of limitations for seeking to rescind a grant of adjustment of status under

section 246(a) of the Act also applies to removal proceedings. *See also Bamidele v. INS*, 99 F.3d 557 (3d Cir. 1996). However, this authority is not consistent with the law of the Ninth Circuit, where the case at hand arises. *See Garcia v. Att'y Gen. of the U.S.*, 553 F.3d at 728 n.4; *see also Monet v. INS*, 791 F.2d 752, 754 (9th Cir. 1986); *Oloteo v. INS*, 643 F.2d 679, 681-83 (9th Cir. 1981). We generally follow a circuit court's precedent in adjudicating a case arising in that circuit. *Matter of Anselmo*, 20 I&N Dec. 25, 31 (BIA 1989).

Moreover, we continue to view our longstanding approach to this issue as consistent with the overall statutory scheme and congressional intent. *See Matter of C-T-L-*, 25 I&N Dec. 341 (BIA 2010) (applying *Chevron, U.S.A., Inc., v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984)). Removal proceedings are different from rescission proceedings and have greater procedural safeguards for the alien. *Stolaj v. Holder*, 577 F.3d 651, 656 (6th Cir. 2009). Furthermore, Congress amended section 246(a) of the Act to clarify that it is not necessary to rescind an alien's permanent resident status before commencing removal proceedings. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 378(a), 110 Stat. 3009-546, 3009-649; *Kim v. Holder*, 560 F.3d 833, 836-38 (8th Cir. 2009).

We are aware of no circuit that has adopted the Third's Circuit's view regarding a 5-year statute of limitations on the commencement of removal proceedings. *See Garcia v. Att'y Gen. of the U.S.*, 553 F.3d at 729-31 (Fuentes, J., dissenting); *see also, e.g.*, *Stolaj v. Holder*, 577 F.3d at 655-56; *Asika v. Ashcroft*, 362 F.3d 264 (4th Cir. 2004). Based on the foregoing, we affirm the Immigration Judge's determination that removal proceedings were properly instituted against the respondent.

## F.  Other Relief from Removal

Finally, the respondent requests that the record be remanded to allow him to seek asylum, withholding of removal, and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"), on account of his fear of criminal prosecution for war crimes based on his service during the war. Inasmuch as the respondent is removable under section 237(a)(4)(D) of the Act, he is statutorily ineligible for asylum, withholding of removal, and withholding under the Convention Against Torture. Sections 208(b)(2)(A)(i), 241(b)(3)(B) of the Act, 8 U.S.C. §§ 1158(b)(2)(A)(i), 1231(b)(3)(B) (2006); 8 C.F.R. §§ 1208.13(c), 1208.16(d)(2) (2010).

However, the respondent is statutorily eligible to seek deferral of removal under the Convention Against Torture, and the Immigration Judge did not consider this issue in the first instance. We will therefore remand the record to the Immigration Judge for the sole purpose of providing the respondent the opportunity to establish his eligibility for such protection. *See* 8 C.F.R. §§ 1003.1(d)(3)(iv), 1208.16(c)(4). In remanding the record, we render no judgment on the merits of the respondent's claim for protection. *See Matter of Interiano-Rosa*, 25 I&N Dec. at 266. Accordingly, the respondent's appeal will be sustained in part and dismissed in part, and the record will be remanded.

**ORDER:** The appeal is sustained in part and dismissed in part.

**FURTHER ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.