# Matter of Carlos Eugenio VIDES CASANOVA, Respondent

*Decided March 11, 2015*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

The respondent is removable under section 237(a)(4)(D) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(4)(D) (2012), where the totality of the record supported the conclusion that, through his "command responsibility" in his role as Director of the Salvadoran National Guard and as Minister of Defense of El Salvador, he participated in the commission of particular acts of torture and extrajudicial killing of civilians in El Salvador, in that they took place while he was in command, he was aware of these abuses during or after the fact, and through both his personal interference with investigations and his inaction, he did not hold the perpetrators accountable.

FOR RESPONDENT: Diego Handel, Esquire, Daytona Beach, FL

FOR THE DEPARTMENT OF HOMELAND SECURITY: James E.M. Craig, Assistant Chief Counsel; David A. Landau, Associate Legal Advisor

BEFORE: Board Panel: MALPHRUS, MULLANE, and CREPPY, Board Members.

MULLANE, Board Member:

In a decision dated August 16, 2012, an Immigration Judge found the respondent removable under section 237(a)(4)(D) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(4)(D) (2012), pretermitted his application for cancellation of removal under section 240A(a) of the Act, 8 U.S.C. § 1229b(a) (2012), and ordered him removed from the United States.[1] The respondent appeals that decision. For the reasons set forth below, the appeal will be dismissed.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of El Salvador. During the period 1979 to 1989, he served as the Director of the Salvadoran National Guard

---

[1] The Immigration Judge's interim decision dated February 22, 2012, includes his factual findings and legal conclusions concerning the charges of removal. He incorporated his interim decision by reference in his August 16, 2012, decision, which denied the respondent's motion to terminate on particular grounds and pretermitted the application for relief.

and then as the Minister of Defense. He entered the United States with an immigrant visa on or about August 21, 1989. In October 2009, the Department of Homeland Security ("DHS") issued a Notice to Appear (Form I-862), alleging that the respondent was responsible for assisting or otherwise participating in acts of torture in El Salvador while in his positions of military leadership and charging him with removability under section 237(a)(4)(D) of the Act, as an alien described in section 212(a)(3)(E)(iii)(I) of the Act, 8 U.S.C. § 1182(a)(3)(E)(iii)(I) (2006). In October 2010, the DHS lodged an additional charge under section 237(a)(4)(D), alleging that during the same period, the respondent assisted or otherwise participated in the commission of extrajudicial killings, as described in section 212(a)(3)(E)(iii)(II) of the Act.[2]

## A. Background

On October 17, 1979, the respondent became the Director of the Salvadoran National Guard.[3] He was promoted to Minister of Defense in April 1983. From 1979 to 1992, and thus during his tenure in both

---

[2] Section 237(a)(4)(D) of the Act renders deportable any alien "described in" section 212(a)(3)(E)(iii), which provides as follows:

> Commission of Acts of Torture or Extrajudicial Killings
> Any alien who, outside the United States, has committed, ordered, incited, assisted, or otherwise participated in the commission of—
>   (I) any act of torture, as defined in section 2340 of title 18, United States Code; or
>   (II) under color of law of any foreign nation, any extrajudicial killing, as defined in section 3(a) of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note), is inadmissible.

Congress added these provisions to the Act in 2004, making them expressly retroactive to encompass acts "committed before, on, or after the date of enactment." Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 5501(a)−(c), 118 Stat. 3638, 3740 ("IRTPA"); see also S. Rep. No. 108-209, at 11−12 (2003), 2003 WL 22846178, at *11−12 (relating to the proposed Anti-Atrocity Alien Deportation Act of 2003, S.710, 108th Cong. (2003), whose language was incorporated into the IRTPA). The purpose in enacting these provisions was to "close loopholes in U.S. immigration laws that have allowed aliens who have committed serious forms of human rights abuses abroad to enter and remain in the country." Matter of D-R-, 25 I&N Dec. 445, 452 (BIA 2011) (quoting S. Rep. No. 108-209, at 1–2) (internal quotation mark omitted).

[3] The National Guard of El Salvador was generally grouped with the National Police and Treasury Police under the category of Salvadoran "Security Forces." The "Armed Forces" of El Salvador included the Army, Navy, and Air Force.

positions, El Salvador was in the midst of a bloody civil war between the Salvadoran Government and guerilla forces.

A military dictatorship governed El Salvador beginning in the 1930s, but opposition to the Government was steadily increasing, particularly after the military annulled the 1972 presidential elections.  A military coup in October 1979 resulted in the creation of a civilian-military junta with a civilian President and some attempts at reform, but those efforts were short-lived.  A new constitution was drafted in 1983, and José Napoleon Duarte was elected President in 1984.  Despite these political changes, the military retained significant power in the Government of El Salvador.

In 1980, opposition groups coalesced to form the Frenté Farabundo Martí para la Liberación Nacional ("FMLN").  In reaction to the resistance, both the Armed Forces and Security Forces began a campaign of repression, resulting in mass killings and torture of civilians who were believed to be supporting the rebels.  "Death squads," often operating as extensions of the Armed Forces and Security Forces, were active throughout the war.  The intensity of violence and number of human rights abuses fluctuated over the course of the war; the period between 1980 and 1981 was one of the most violent.  In total, approximately 70,000 civilians were killed during the war.

The United States viewed the conflict in El Salvador as a fight against potential communist influence in the Western Hemisphere.  Consequently, the United States sent military advisors and personnel, equipment, and funding in support of the Salvadoran Government.  At the same time, however, United States Government officials consistently expressed concern about reports of human rights violations committed by the Armed Forces and Security Forces.

In 1981, the United States Congress voted to require annual certification by the Salvadoran Government that it was making significant efforts to comply with international human rights standards.  In October 1983, Secretary of State George Schultz traveled to El Salvador to meet with the respondent in his role as Minister of Defense, in part to discuss human rights abuses, including particular cases and individuals.  Two months later, Vice President Bush visited El Salvador and indicated that the United States would end its military assistance unless the Salvadoran Government took concrete measures to curb human rights abuses.

The number of human rights abuses decreased significantly after Vice President Bush's visit.  However, the improvement was not sustained, and by 1986 human rights violations were again on the rise.  In 1988, President Bush sent Vice President Quayle to El Salvador to again encourage improvements in the human rights situation, and to urge that certain officers be removed from the country because of their involvement in human rights

abuses.  In 1989, the United States temporarily ceased providing aid to the Salvadoran Government.

Peace accords between the Government and the FMLN, brokered by the United Nations, were signed on January 16, 1992.  After the war, the United Nations created the Commission on the Truth for El Salvador ("Truth Commission") to investigate "serious acts of violence" committed during the war.  Commission on the Truth for El Salvador, *From Madness to Hope: The 12-Year War in El Salvador*, at 18, U.N. Doc. S/25500 (Mar. 15, 1993), *available at* http://www.usip.org/sites/default/files/file/ElSalvador-Report.pdf.  The Truth Commission received more than 22,000 complaints of flagrant human rights violations.  *Id.* at 43.  It concluded that "there was a succession of indiscriminate attacks on the non-combatant civilian population and also collective summary executions, particularly against the rural population."  *Id.* at 27.  Individuals who gave testimony to the Commission attributed over 85 percent of cases to the Armed and Security Forces and the associated death squads, while the FMLN was named in only about 5 percent of all complaints.  *Id.* at 43.

## B.  Immigration Court Proceedings

The DHS charged that the respondent is removable as an alien described in both sections 212(a)(3)(E)(iii)(I) and (II) of the Act, because he assisted or otherwise participated in acts of torture and extrajudicial killings in his roles as military commander between 1979 and 1989.

During the removal hearing, which lasted 7 days, the DHS presented testimony from Ambassador Robert White, U.S. Ambassador to El Salvador from February 1980 to February 1981; Mr. Pedro Daniel Alvarado ("Mr. Alvarado"), a Salvadoran torture survivor; Dr. Juan Romagoza Arce ("Dr. Romagoza"), also a Salvadoran torture survivor; and Dr. Terry Lynn Karl, Ph.D., Professor of Political Science at Stanford University.  The Immigration Judge qualified Dr. Karl as an expert witness on the civil war in El Salvador, the response to human rights abuses by the Salvadoran Government and the Armed Forces, the political situation during and leading up to the civil war, and the structure and organization of the Salvadoran military.

The DHS also submitted numerous documents, including the Truth Commission Report, written reports from Professor Karl and others concerning El Salvador's civil war, and United States Department of State cables and memoranda from the period between 1979 and 1989.

The respondent testified on his own behalf and presented testimony from Ambassador David Passage, U.S. Deputy Chief of Mission to El Salvador from June 1984 to June 1986, and Ambassador Edwin Corr,

U.S. Ambassador to El Salvador from 1985 to 1988. The Immigration Judge qualified Ambassador Corr as an expert witness on the Salvadoran civil war, counterinsurgency and terrorism, and the Salvadoran military and Government during the time that he served in El Salvador. The respondent also submitted letters and awards he received from United States Government officials.

The Immigration Judge concluded that the respondent was removable as charged. He found the testimony of Mr. Alvarado and Dr. Romagoza to be credible and concluded that the respondent assisted or otherwise participated in the torture of both men. He further found that the respondent assisted or otherwise participated in acts of torture "generally" during the period between 1979 and 1989.

The Immigration Judge also concluded that the respondent assisted or otherwise participated in six well-known and documented instances of extrajudicial killing. He found that the respondent's failure to investigate the killings after the fact, to cooperate with the investigations (which he impeded), and to ultimately hold the accused perpetrators accountable all amounted to assistance or participation in the killings. According to the Immigration Judge, there was clear and convincing evidence that, apart from these particular events, the respondent participated in extrajudicial killing "generally" during the period between 1979 and 1989.

## II. ANALYSIS

### A. Standard of Review

We review the Immigration Judge's findings of fact, including the determination of credibility, under the "clearly erroneous" standard. 8 C.F.R. § 1003.1(d)(3)(i) (2014). We review de novo questions of law, discretion, and judgment, and all other issues, including whether the parties have met the relevant burden of proof. 8 C.F.R. § 1003.1(d)(3)(ii).

An Immigration Judge's findings concerning the likelihood of future events are factual determinations that we review for clear error. *Zhou Hua Zhu v. U.S. Att'y Gen.*, 703 F.3d 1303, 1314 (11th Cir. 2013). Inferences from direct and circumstantial evidence are also reviewed for clear error. *Matter of D-R-*, 25 I&N Dec. 445, 454 (BIA 2011). Finally, the Immigration Judge's decision to credit the plausible testimony of one witness over that of another witness is reviewed for clear error. *See id.*; *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574−75 (1985).

## B.  Admissibility of Expert Witness Testimony and Reports

The respondent argues that Dr. Karl's testimony and written evidence is inadmissible and that Dr. Karl should not have been qualified as an expert witness.  He contends that some of her testimony was based on hearsay statements, rather than her personal knowledge, and that her written report contains numerous references to testimony by many declarants who are either unidentifiable or otherwise not subject to effective cross-examination.  He argues that hearsay evidence is admissible only if it is "uncontradicted" and that, in this case, the statements Dr. Karl relied on "are not undisputed."  Finally, he contends that the testimony is not sufficiently probative or reliable because Dr. Karl is "admittedly sympathetic toward the so-called rebels who were the former adversaries of the military junta in which Respondent was an officer."

We affirm the Immigration Judge's inclusion of Dr. Karl's testimony and written evidence in the record.  The formal rules of evidence do not apply in immigration proceedings.  *Garces v. U.S. Att'y Gen.*, 611 F.3d 1337, 1347 (11th Cir. 2010); *Matter of D-R-*, 25 I&N Dec. at 458; *see also INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039–40, 1050–51 (1984).  Hearsay evidence is admissible in immigration proceedings "if it is probative and its use is not fundamentally unfair so as to deprive the [alien] of due process." *Cortez v. U.S. Att'y Gen.*, 446 F. App'x 166, 168 (11th Cir. 2011) (quoting *Tashnizi v. INS*, 585 F.2d 781, 782–83 (5th Cir. 1978) (internal quotation mark omitted)); *see also Matter of D-R-*, 25 I&N Dec. at 458, 461.

The Immigration Judge did not clearly err in finding that Dr. Karl's testimony and written report were reliable and probative.  *See* 8 C.F.R. § 1240.7(a) (2014) (providing that an Immigration Judge may receive in evidence any oral or written statement that is material and relevant).  He correctly found that Dr. Karl's opinions are "reasonable inferences drawn from the facts and data" during the war, which were described by Dr. Karl and recorded in detail in the written evidence.  It was reasonable for the Immigration Judge to conclude that any sympathy Dr. Karl may have with the opposition forces did not make her testimony unreliable.

Moreover, as an expert witness, Dr. Karl is permitted to base her opinion on hearsay evidence and need not have personal knowledge of the facts underlying those opinions.  *Matter of D-R-*, 25 I&N Dec. at 459–60; *accord* Fed. R. Evid. 702.  We agree with the Immigration Judge's qualification of Dr. Karl as an expert witness in the areas he delineated. Her experience and knowledge concerning Central America generally, and El Salvador in particular, are well documented in her curriculum vitae and her report.  She traveled extensively in El Salvador and the region and, during the relevant period, interviewed hundreds of people concerning

El Salvador, including individual leaders on both sides of the conflict. She also conducted extensive independent research, and many of the primary and secondary sources that form the basis of her testimony are in the record.

The Immigration Judge also did not clearly err in admitting the Truth Commission report, contrary to the respondent's contention. In compiling its report, the Truth Commission received testimony from 2,000 primary sources referring to more than 7,000 victims, information from secondary sources relating to more than 20,000 victims, and written evidence from both the Salvadoran Government and its opponents. There is therefore no indication that the report is not probative or reliable. *See Chavez v. Carranza*, 559 F.3d 486, 496–97 (6th Cir. 2009) (upholding the admissibility of Dr. Karl's testimony, which was based, in part, on the Truth Commission report); *Arce v. Garcia*, 434 F.3d 1254, 1264 (11th Cir. 2006) (quoting the Truth Commission report). *See generally Malkandi v. Holder*, 576 F.3d 906, 916 (9th Cir. 2009) (upholding the admission of the 9/11 Commission Report into evidence as being "akin to an expert report").

## C. "Assisted or Otherwise Participated"

According to section 237(a)(4)(D) of the Act, "[a]ny alien described in clause (i), (ii), or (iii) of section 212(a)(3)(E) is deportable." Section 212(a)(3)(E)(iii) of the Act includes any alien who has "committed, ordered, incited, assisted, or otherwise participated in the commission of" any act of either torture or extrajudicial killing.

In *Matter of A-H-*, 23 I&N Dec. 774, 784 (A.G. 2005), the Attorney General ruled that these terms "are to be given broad application" and "do not require direct personal involvement." In that case, the alien was a leader-in-exile of a political movement in Algeria, and he requested asylum in the United States. The issue was whether he "ordered, incited, assisted, or otherwise participated in" persecution in Algeria and was thus ineligible for asylum under section 208(b)(2)(A)(i) of the Act, 8 U.S.C. § 1158(b)(2)(A)(i) (2000) (known as the "persecutor bar"). *Id.* at 783. The Attorney General concluded that the standard was "broad enough to encompass aid and support provided by a political leader to those who carry out the goals of his group, including statements of incitement or encouragement and actions that result in advancing the violent activities of the group." *Id.* at 784. The United States Court of Appeals for the Eleventh Circuit also held that the persecutor bar does not require that the alien personally harm the alleged victim. *Chen v. U.S. Att'y Gen.*, 513 F.3d 1255, 1259 (11th Cir. 2008).

In *Matter of D-R-*, 25 I&N Dec. 445, we applied section 212(a)(3)(E)(iii) of the Act to an alien who was in a military leadership role.  We noted that according to the legislative history of the statute, section 212(a)(3)(E)(iii) was "intended to reach the behavior of persons directly or personally associated with the covered acts, including those with command responsibility."  *Id.* at 452 (quoting S. Rep. No. 108-209, at 10 (2003)) (internal quotation marks omitted).  The term "command responsibility" means that

> a commander is responsible for unlawful acts when (1) the forces who committed the abuses were subordinates of the commander (i.e., the forces were under his control either as a matter of law or as a matter of fact); (2) the commander knew, or, in light of the circumstances at the time, should have known, that subordinates had committed, were committing, or were about to commit unlawful acts; and (3) *the commander failed to prove that he had taken the necessary and reasonable measures to (a) prevent or stop subordinates from committing such acts, or (b) investigate the acts committed by subordinates in a genuine effort to punish the perpetrators*.  Attempts and conspiracies to commit these crimes are encompassed in the "otherwise participated in" language.  This language addresses an appropriate range of levels of complicity for which aliens should be held accountable . . . .

*Id.* at 452–53 (emphasis added).  We also noted that cases cited in the Senate Report reflected that there is a "continuum of conduct ranging from passive acceptance, which does not meet the legal standard, to active, personal participation, which clearly does."  *Id.* at 453.

The respondent does not dispute that the Armed Forces and Security Forces of El Salvador committed torture and extrajudicial killing during the war.  He is not charged with personally inflicting physical harm on his alleged victims or directly ordering his subordinates to torture or kill any individual or group.[4]  The issue, therefore, is whether the respondent's actions, or failures to act, as a military commander fall within the definition of assisting or otherwise participating in either extrajudicial killing or torture.  The respondent contends that, to be found removable, it must be

---

[4]   We agree with the respondent that he is not subject to removal because he may have been mentioned in the legislative history of the statutory removal provision or because the enactment of the provision may have been directed at his personal circumstances. *See* S. Rep. No. 108-209, at 4 (referring to a former Salvadoran official who made no serious effort to investigate the murders of four American churchwomen in 1980 and who currently lives in Florida).  The Immigration Judge did not decide the case on this basis. The inquiry is whether the respondent's actions fell within the conduct articulated in the statute.

shown that he knew of, and "took personal action to promote or facilitate" the described acts.

We disagree with the respondent's formulation of the standard. Congress clearly intended that commanders should be held accountable if their subordinates commit torture or extrajudicial killings. *See* S. Rep. No. 108-209, at 10. As we held in *Matter of D-R-*, when applying the statute to the case of an individual with "command responsibility," we rely on Congress' expressed intent and consider whether the alien "knew, or, in light of the circumstances at the time, should have known, that subordinates had committed, were committing, or were about to commit unlawful acts" and whether he took "the necessary and reasonable measures to (a) prevent or stop subordinates from committing such acts, *or* (b) investigate the acts committed by subordinates in a genuine effort to punish the perpetrators." 25 I&N Dec. at 453 (emphasis added) (quoting S. Rep. No. 108-209, at 10). The statute does not require the alien to have taken personal action to promote or facilitate the alleged acts before or during their commission, as the respondent argues. It is sufficient that he (1) had knowledge that his subordinates committed unlawful acts and (2) failed to take action to investigate those acts *afterwards* in a genuine effort to punish the perpetrators.[5]

## D. Respondent's Roles and Responsibilities

The respondent argues that he was not responsible for any torturous acts or extrajudicial killings committed by the National Guardsmen and soldiers. He contends that many pro-Government forces acted autonomously and that he lacked control over these "rogue units." He further contends that even if he had taken any preemptive or corrective actions, such actions would not have had any significant effect.

Even if the respondent's argument regarding "rogue units" supports a legal basis to conclude that he did not have the requisite command responsibility for section 237(a)(4)(D) of the Act to apply, the Immigration Judge correctly found that the respondent had control over his subordinates. As head of the National Guard, the respondent personally led a small officer corps of 16 men. He also had ultimate responsibility for the

---

[5] The statute does not require a finding of motive to determine that the alien is removable. Nor does it require a finding that the torture or extrajudicial killing had a lasting effect or played a part in some larger act. Thus, it is not necessary for us to consider the Immigration Judge's determination that the respondent's failure to act "contributed to an attitude" with the Security Forces and Armed Forces that torture and extrajudicial killing could be committed "with impunity."

National Guard's intelligence unit and could have used this unit to investigate misconduct. Later, as Minister of Defense, the respondent was the head of the Armed Forces and directed the Security Forces. In this position, he was also a member of President Duarte's cabinet. Essentially, he was the most powerful person in the military, which was the most powerful force in the country. In fact, the respondent acknowledged that all members of the Armed Forces were his subordinates and that disobeying any of his orders would result in punishment, including dismissal. He testified that there were no acts of insubordination to any of his orders.

According to the record, United States officials considered the respondent to have command responsibility for his subordinates' actions. Ambassador White testified that he discussed human rights violations directly with the respondent in his role as Director of the National Guard. In March 1980, Ambassador White sent a cable to the Secretary of State, in which he related that elements of the Security Forces were conducting a campaign of terror in the countryside and that the command structure of the army and the Security Forces was either tolerating or encouraging the activity. He clarified in his testimony that this "command structure" included the respondent. An Embassy cable in May 1980 named the respondent as one of three officials who could "stop the repression if they wished."

On appeal, the respondent argues that Ambassador White's testimony supports his assertion that he did not have the ability to stop his subordinates from engaging in torture and extrajudicial killing while he was Director of the National Guard. Ambassador White testified, however, that those in command never claimed that they were unable to control their subordinates.

The respondent also acknowledged that when he was Minister of Defense, he met with Ambassadors Passage and Corr on a weekly or biweekly basis and had additional meetings with other United States officials. He admitted that a perennial subject was the United States officials' concerns with the democratic process and human rights. Ambassador Passage testified that the United States and President Duarte tasked the respondent with changing the abusive behavior of the Armed Forces. Ambassador Corr agreed that as Minister of Defense, the respondent had a duty to investigate allegations of human rights abuses. He also testified that the respondent had the ability to bring members of the military to justice if they disobeyed a military order, which was demonstrated by the respondent's eventual assistance in moving one case to civilian trial.

Many times during the war, United States officials identified Salvadoran officials who should be held accountable. During his December 1983 visit,

Vice President Bush presented Salvadoran officials with a list of eight names of individuals in the Armed Forces and Security Forces who had extensive records of human rights violations and who should be removed. In a private meeting with the respondent, Vice President Bush referred to a list of Salvadoran officials or ex-officials who had been linked with death squads and who should be reassigned. Ambassador Corr testified that between 1985 and 1988, he had frank discussions with the respondent about human rights abuses by the military, including identification of specific officers.

The record reflects, however, that the officer corps of the Armed Forces and Security Forces was not held accountable for documented acts of torture and extrajudicial killing. The respondent testified that as Minister of Defense, he issued a permanent order to the entire Armed Forces to respect the human rights of everyone in El Salvador. He acknowledged that any killings of civilians would have been a violation of this order. Yet, Ambassador White testified that, to his knowledge, during his tenure in El Salvador no officer was ever punished for human rights violations. Ambassador Corr testified that none of the individuals he discussed with the respondent was actually prosecuted, and some were given command positions "because of their effectiveness." Ambassador Passage testified that he was aware of a June 1984 agreement between President Duarte and the respondent that when he became President of El Salvador, Duarte would not seek prosecution of military officials for past human rights abuses.

In summary, this is not a case in which isolated or random human rights abuses took place at the hands of rogue subordinates, far outside the purview of a high ranking commander. This is also not the case of a military leader who was unaware that wrongs were committed under his watch, only to learn of the harm and the perpetrators long after the fact. To the contrary, as the Immigration Judge found, the respondent led the National Guard and the military when there were numerous high profile incidents of human rights violations occurring year after year without any significant action by the respondent to remedy or deter his subordinates' misconduct.

The respondent's personal interference with legitimate investigations and his inaction with regard to other incidents—even after United States authorities brought to his attention credible evidence of specific soldiers under his command committing acts of torture—prevented bringing perpetrators to justice. The respondent's conduct affirmatively and knowingly shielded subordinates from the consequences of their acts and promoted a culture of tolerance for human rights abuses. The record clearly shows that the respondent was aware of pervasive abuses that took place

while he was in command of his nation's Armed Forces and that, through both action and inaction, he did not hold the perpetrators accountable and even protected them at times. In short, we are satisfied that the respondent was proximate enough to the human rights abuses to be accountable for them under the applicable legal standard.

Accordingly, the Immigration Judge did not clearly err in finding that the respondent had the authority and control over his subordinates to give him the requisite "command responsibility." *See* 8 C.F.R § 1003.1(d)(3)(i). Thus, the respondent's contentions concerning his limited authority over military personnel are not persuasive and do not make section 237(a)(4)(D) of the Act inapplicable in this case.

## E. Allegations of Torture

"Torture" is defined in 18 U.S.C. § 2340(1) (2012) as, "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." Two specific instances of torture are discussed below.

### 1. Dr. Romagoza

On December 12, 1980, Dr. Romagoza, then a medical student, travelled to the town of Santa Anita, located about an hour outside of San Salvador, to provide medical care as part of a church-sponsored celebration. As he was preparing a mobile clinic, members of the Army, National Guard, and a paramilitary group called ORDEN pulled up to the scene and started firing their weapons. Dr. Romagoza was shot in the ankle. The soldiers detained and transported him, first to Army Headquarters, then to National Guard headquarters in San Salvador.

Dr. Romagoza testified that, for 22 days during his detention, he was tortured repeatedly. He was beaten, shocked with electrical probes all over his body, sexually assaulted with a stick, and hung from the ceiling for several days. He was also shot in the left arm, leaving him with a lifelong disability. His wounds were not cleaned or dressed until 2 days before his release. He was interrogated daily, sometimes multiple times a day, concerning his participation in guerilla groups and whether he knew anyone who was involved with the guerillas.

Because the respondent was the Director of the National Guard at the time, his office was located at the National Guard headquarters, near where Dr. Romagoza was being held. Dr. Romagoza testified that, one day,

during his imprisonment, the respondent accompanied Dr. Romagoza's uncle, Salvador Mejia Arce, who was a lieutenant colonel in the National Guard, to question him. While the respondent was interrogating Dr. Romagoza, another captor removed worms from Dr. Romagoza's open wounds and told him to eat them. Dr. Romagoza was also kicked by his uncle and others, and someone put his foot on Dr. Romagoza's chest. Although he was blindfolded at the time, Dr. Romagoza testified that he was "90 percent sure" that the respondent was present during this incident.

When Dr. Romagoza was released on January 5, 1981, he was escorted out of National Guard Headquarters by another uncle, Manuel Rafael Arce, who was also a lieutenant colonel in the National Guard. Dr. Romagoza weighed 75 pounds and could not walk by himself. As he left, he saw the respondent and Lieutenant Colonel Salvador Mejia Arce watching him depart.

The respondent filed a motion in limine with the Immigration Judge, arguing that any identification evidence derived from Dr. Romagoza should be excluded. The Immigration Judge denied the motion, concluding that Dr. Romagoza's testimony would be relevant and probative. The Immigration Judge found that despite some minor inconsistencies in his testimony, Dr. Romagoza was credible because his testimony was otherwise unembellished, his details were specific, and his demeanor was appropriate to his narrative.

The respondent does not dispute that Dr. Romagoza was tortured. He also acknowledges that Dr. Romagoza's testimony, "if believed, might be sufficient to establish [the respondent's] personal involvement in torture." He argues, however, that the Immigration Judge clearly erred in finding that Dr. Romagoza was credible, given the multiple inconsistencies between his testimony in these proceedings and the testimony he gave in a prior civil suit, particularly concerning his identification of the respondent. *Arce v. Garcia*, 434 F.3d 1254 (11th Cir. 2006). In his prior testimony, Dr. Romagoza said that, during the interrogation, he could not see the respondent's face and could only see the parts of the respondent below his belt. He testified at the immigration hearing, however, that he could see up to the respondent's nose.

While the record may support different conclusions, the Immigration Judge's credibility finding was not clear error. *See* 8 C.F.R. §1003.1(d)(3)(i) (providing that in order to overturn a credibility finding, the Board must be convinced that the Immigration Judge clearly erred). Dr. Romagoza admitted that he was blindfolded during the interrogation and stated that when he was *not* moving, he could only see up to the respondent's navel, which is similar to the "belt" area he described in his prior testimony. He testified that when he moved (for example, while being

hit), he could see up to the respondent's chin or nostrils. During cross examination, Dr. Romagoza was asked about his prior testimony, and while he agreed that it was slightly inconsistent, he pointed out that he consistently said that he could not see the respondent's full face. He also relied on other clues for his identification of the respondent, such as hearing the other people in the room deferring to the new interrogator, and noticing that the individual's pants and shoes were of a higher quality than the others' uniforms. We affirm the Immigration Judge's determination that Dr. Romagoza was a credible witness.

The Immigration Judge found that the respondent "assisted or otherwise participated" in the torture of Dr. Romagoza because he was the highest-ranking person in the room while Dr. Romagoza was being kicked and told to eat the worms from his wounds, and the respondent failed to prevent these acts. The Immigration Judge concluded that even if the respondent had not been present in the room during the torturous acts, he knew about Dr. Romagoza's torture and did not order his release.

The evidence supports the conclusion that the respondent assisted or otherwise participated in Dr. Romagoza's torture. It is sufficient that the respondent was the highest ranking officer in the room, the torture took place at National Guard headquarters, and the respondent did not prohibit or prevent the torture. He need not be the person who physically tortured the victim under these circumstances. The respondent knew that subordinates committed unlawful acts and did not take "reasonable measures to prevent or stop such acts." Accordingly, we also agree with the Immigration Judge's determination that the respondent is removable under section 237(a)(4)(D) of the Act for assisting or otherwise participating in the torture of Dr. Romagoza.

### 2. Mr. Alvarado

On August 25, 1983, Mr. Alvarado was kidnapped from San Salvador and taken to a cell where he was interrogated and tortured. He was a college student at the time, and he was also on the board of his school's student council, which was perceived to be indirectly affiliated with a leftist guerilla group. Mr. Alvarado testified that he was not a guerilla, although he sympathized with the guerillas. At first, his interrogation focused on his affiliation with these groups.

His captors later questioned him about a United States military advisor, Lieutenant Commander Albert Schaufelberger, who had been killed in El Salvador the previous year. After 7 days of torture, including receiving electric shocks and being repeatedly hung from the ceiling in an "airplane" position, which nearly caused him to suffocate, Mr. Alvarado agreed to

sign a confession that he killed Lieutenant Commander Schaufelberger. However, even after confessing and attending a staged press conference shortly thereafter, he remained incarcerated.

Soon after his capture, Mr. Alvarado determined that he was being held by the Treasury Police. Major Ricardo Pozo, head of Section 2 of the Treasury Police, visited him at least once a day. Colonel Nicolas Carranza, who was the head of the Treasury Police, also visited him and directed his interactions with the press. Significantly, another colonel claiming that he was the respondent's "representative" also visited Mr. Alvarado. This colonel offered to release Mr. Alvarado if he agreed to help the military by interacting with the guerillas and reporting back. Mr. Alvarado declined, and on January 31, 1984, he was transferred to a penitentiary.

Meanwhile, the United States Federal Bureau of Investigation ("FBI") was investigating the death of Lieutenant Commander Schaufelberger in El Salvador. As part of their investigation, FBI officers interviewed Mr. Alvarado and concluded that he was not the person who killed Lieutenant Commander Schaufelberger. On November 11, 1983, Ambassador Pickering personally informed the respondent that Mr. Alvarado was being held and tortured, and that Major Pozo was involved. At two other meetings, high-ranking United States officials discussed Mr. Alvarado's wrongful confinement and torture with the respondent. When Mr. Alvarado's family visited him in detention in 1984, they told him that a United States Embassy official had signed a document stating that Mr. Alvarado was not guilty of killing Lieutenant Commander Schaufelberger. However, Mr. Alvarado was not released from the penitentiary until April 14, 1986.

The respondent does not contest the Immigration Judge's finding that the acts described by Mr. Alvarado are "torture." He also acknowledged in his testimony that he knew that Mr. Alvarado was detained and interrogated, but he denied knowing at the time that Mr. Alvarado was being tortured. The respondent argues that Mr. Alvarado's claim that he was visited by someone who claimed to be the respondent's representative is inadmissible hearsay. He also contends that as a former "pro-guerilla 'combatant,'" Mr. Alvarado is biased against the respondent. According to the respondent, even if Mr. Alvarado is credible, there is nothing in his testimony to establish that the respondent "assisted or participated in" his torture.

There is no clear error in the Immigration Judge's finding that Mr. Alvarado was a credible witness. The Immigration Judge found that Mr. Alvarado's testimony was probative and reliable, because it was detailed, specific, internally consistent, and delivered with a demeanor consistent with his narrative. *See* section 240(c)(4)(C) of the Act,

8 U.S.C. § 1229a(c)(4)(C) (2012) (listing the factors to be considered in a credibility determination). The Immigration Judge also noted that Mr. Alvarado's testimony was corroborated by Dr. Karl's testimony and by documentary evidence in the record, including State Department reports regarding a lie detector test administered by the FBI. Mr. Alvarado testified that he was not a guerilla combatant, and the respondent has not provided evidence to rebut his assertion. There is no evidence in the record that Mr. Alvarado is "biased" against the respondent.

The Immigration Judge also did not clearly err in finding that the respondent was aware of the details of Mr. Alvarado's torture, but took no action to investigate until the United States demanded action. Even then, the respondent did not hold the perpetrators accountable. The Immigration Judge noted that in December 1983, Vice President Bush presented the respondent with a list of human rights abusers under his command who should be removed. The list included both Major Pozo and Colonel Carranza. Major Pozo was transferred but not dismissed, and he was later promoted. Colonel Carranza was relieved of his command after his name appeared on the list, and he eventually left for the United States. Thus, the respondent knew that his subordinates had committed acts of torture and did not take "reasonable measures" to prevent or stop such acts or investigate "in a genuine effort to punish the perpetrators." S. Rep. No. 108-209, at 10. He is therefore removable under section 237(a)(4)(D) of the Act for assisting or otherwise participating in the torture of Mr. Alvarado.[6]

## F. Allegations of Extrajudicial Killing

The definition of "extrajudicial killing" in section 212(a)(3)(E)(iii)(II) of the Act refers to section 3(a) of the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73, 73 (1992) ("TVPA"), which provides:

> EXTRAJUDICIAL KILLING.—For the purposes of this Act, the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term,

---

[6] Sections 212(a)(3)(E)(iii)(I) and 237(a)(4)(D) of the Act require only one act of participation in torture to establish removability. Since we affirm the Immigration Judge's determination that the respondent assisted or otherwise participated in the two specific acts of torture described above, we need not address the Immigration Judge's determination that during the period between 1979 and 1989, the respondent generally assisted or participated in acts of torture.

however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

The respondent does not contest that the Salvadoran National Guard committed extrajudicial killings between 1979 and 1983, when he was the Director, and that the Armed Forces committed extrajudicial killings during the period that he was the Minister of Defense. More specifically, the respondent does not contest the Immigration Judge's determinations that the events described below all constituted extrajudicial killings within the meaning of section 3(a) of the TVPA. The issue, therefore, is what role, if any, the respondent played in the extrajudicial killings.

### 1. American Churchwomen

On December 2, 1980, four American churchwomen were kidnapped as they left the Salvadoran International Airport.[7] The women were taken by van to a rural location, raped, and shot. The bodies were left at the scene. The women were reported missing the same day. The next day, their burned-out van was discovered on the highway, and the bodies were found afterwards. This event was widely publicized at the time it occurred and is well documented in the record.

National Guardsmen were soon implicated in the killings. Ambassador White testified that as soon as he learned of the churchwomen's disappearance, he called General Garcia, then-Minister of Defense. From their conversation it appeared to Ambassador White that General Garcia was already aware of the murders.[8] President Duarte indicated to United States officials that if military personnel were implicated, the military would be responsible for holding the perpetrators accountable. Despite a confession from one of the Guardsman, however, two investigations—one ordered by the Salvadoran Government; the other ordered by the respondent and conducted by Major Zepeda, his direct subordinate—concluded that the National Guard was *not* responsible for the murders.

The United States Embassy staff, including Ambassador White, conducted an independent investigation with the FBI, which revealed the identities of the Guardsmen involved. In April 1981, United States officials turned those names over to President Duarte. The respondent ordered the

---

[7]  Three of the women were nuns from the Maryknoll order and the fourth was a layperson volunteer.

[8]  In his interim decision, the Immigration Judge related that Ambassador Corr testified that he called the respondent when he first learned that the churchwomen's van had been found. In his final decision, the Immigration Judge corrected this error, clarifying that Ambassador White testified that he called General Garcia.

arrest of the named Guardsmen, but they were not arrested. After receiving pressure from the United States, the Salvadoran Government undertook another investigation and, with assistance from the FBI, tied the same Guardsmen to the crime. The Guardsmen were taken into custody in 1982, but they still were not prosecuted.[9]

The United States Secretary of State requested another independent investigation. Judge Harold R. Tyler, Jr., conducted that investigation, and in December 1983, he submitted his report to the Secretary of State. Harold R. Tyler, Jr., *The Churchwomen Murders: A Report to the Secretary of State* (Dec. 2, 1983), *available at* http://foia.state.gov/searchapp/ DOCUMENTS/churchwomen/3925.PDF (hereinafter "Tyler Report"). The Tyler Report concluded that there was overwhelming evidence that the National Guardsmen being held committed the crime. In 1984, the Guardsmen were tried and sentenced to 30 years in prison.

The Tyler Report concluded that it was unlikely the kidnapping was ordered by high-ranking officers. However, it also found that high-ranking officers, including Major Zepeda, who conducted the initial investigation, knew the identity of the perpetrators within days of the crime. The Tyler Report further concluded that the purpose of the first two Salvadoran investigations was to absolve the Salvadoran Security Forces of responsibility for the murders. The Tyler Report found that Major Zepeda had actively and personally covered up the Guardsmen's involvement. As for the respondent, the Tyler Report concluded that "it is quite possible" that he was aware of, and for a time acquiesced in, the cover-up, because it was unlikely that Major Zepeda would not have reported it to him.

The Truth Commission also addressed the murders of the churchwomen. It concluded that the respondent and other commanders "knew that members of the National Guard had committed the murders pursuant to orders of a superior," and that the respondent and General Garcia "made no serious effort to conduct a thorough investigation of responsibility for the murders."

The Immigration Judge did not clearly err in finding that the respondent, as Director of the National Guard, had a duty to investigate these extrajudicial killings but failed to do so in a competent manner. In addition to the factual findings above, he noted the Tyler Report's observations that the respondent had been "evasive" when interviewed about the murders and

---

[9] There is some confusion as to the number of Guardsmen implicated, charged, and found guilty. The Immigration Judge refers to four individuals. The record reflects that, although many were implicated or interviewed, five men were ultimately charged and found guilty—an officer and his four subordinates who were present at the assault and murder.

that the main perpetrator's fingerprints were not provided to the FBI during its investigation. The Immigration Judge correctly determined that the respondent knew that National Guardsmen confessed to involvement in the murders, failed to competently investigate the Guardsmen under his command, obstructed the United States' efforts to investigate, and delayed bringing the perpetrators to justice. We therefore agree with his conclusion that the respondent is removable under section 237(a)(4)(D) of the Act for assisting or otherwise participating in the extrajudicial killing of the American churchwomen.

## 2. Sheraton Hotel Killings

On January 3, 1981, two members of the National Guard walked into the San Salvador Sheraton Hotel and shot and killed one Salvadoran man and two United States citizens. The Salvadoran was a labor leader and the head of a government agency in charge of agrarian reform. The United States citizens were advisors from a United States labor organization. The Immigration Judge's decision references the extensive documentation of the event and the subsequent efforts to bring the perpetrators to justice.

The two National Guardsmen who committed the murders were eventually convicted. However, the superior officers who were present at the hotel and ordered the killings—Major Mario Denis Moran, Chief of Section 2 of the National Guard; Lieutenant Rodolfo Isidro Lopez Sibrian, second in command of Section 2; and Captain Eduardo Avila Avila—were never convicted.

The evidence demonstrates that the respondent knew about the involvement of the National Guard officers in the Sheraton murders no later than September 1982, yet he did not remove any of the involved officers from active duty. In a July 1983 memorandum concerning the Sheraton murders, the chief United States investigator emphatically stated that the respondent had the authority and jurisdiction to investigate his officers' involvement in this crime, but he did not take any action to do so and, in fact, delayed the investigation by waiting for written orders from the Minister of Defense. The respondent also refused to give the appointed Salvadoran investigator any written instructions or authority. After the investigation was complete, the respondent refused to forward the report directly to the assigned court, instead referring it to the Minister of Defense.

The respondent also did not arrest Captain Avila, even though the United States Ambassador urged him to do so in a July 1983 meeting, as did Vice President Bush in December 1983. The respondent was aware that Captain Avila disappeared at some point after the murders. Although Captain Avila was subject to arrest for "desertion," he was known to be

staying near National Guard Headquarters and meeting with officers of the Armed Forces and Security Forces.

After Lieutenant Lopez Sibrian came under judicial scrutiny for his role in the killings, the respondent defended him to a United States Embassy official and expressed the desire to "transfer" him to avoid prosecution. Lieutenant Lopez Sibrian was transferred to the Fourth Brigade in 1983. In June 1983, the respondent promoted Major Moran to be commander of the Engineering Center and then promoted him again in 1985, even after he was implicated in these and other extrajudicial killings.

The individuals who planned and ordered the Sheraton murders were the respondent's subordinates. The respondent knew, or should have known, that these subordinates were involved. He failed to investigate or make a genuine effort to punish the perpetrators. Therefore, we agree with the Immigration Judge's determination that the respondent is removable for assisting or otherwise participating in these extrajudicial killings.

### 3. Additional Extrajudicial Killings

The Immigration Judge analyzed the respondent's role in four other extradjudicial killings: the Toledo/Bazzaglia murders, the Las Hojas Massacre, the Puerto del Diablo Murders, and the San Sebastian Massacre. Because a single extrajudicial killing is sufficient to satisfy the DHS's burden of proof, we need not address these other incidents.

### G. Political Question Abstention and Collateral Estoppel

The respondent argues that the Immigration Judge's jurisdiction to determine his removability is precluded by the "political question abstention doctrine." *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (enumerating the factors that render a case nonjusticiable as a political question). We are not persuaded. The nonjusticiability of a political question is primarily a function of the separation of powers, that is, the retention of the Executive Branch's authority over political questions, without a redetermination of those questions by the Judicial Branch. *See id.* at 210; *see also Aktepe v. USA*, 105 F.3d 1400, 1402 (11th Cir. 1997) ("The justiciability of a controversy depends . . . upon whether judicial resolution of that controversy would be consonant with the separation of powers principles embodied in the Constitution."). The division of prosecution and adjudicative powers between two different Executive Branch departments, the DHS and the Department of Justice, makes no difference in its retention

of authority. There is no Judicial Branch encroachment in removal proceedings.[10]

Further, unlike the cases cited by the respondent, in this case the Immigration Judge was not asked to decide the wisdom, reasonableness, or legality of foreign policy decisions by former Executive Branch officials. *Cf. Gonzales-Vera v. Kissinger*, 449 F.3d 1260 (D.C. Cir. 2006) (citing *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) (affirming the dismissal of a tort action claiming that the United States and National Security Adviser Kissinger had caused the kidnapping, torture, and death of the plaintiffs' decedent in Chile through the Executive Branch's foreign policy decisions)). The Immigration Judge also did not address the respondent's culpability under the laws of El Salvador.

The respondent also contends that it is "manifestly unjust" for the United States Government to remove him. He asserts that during his tenure as Director of the National Guard and Minister of Defense, he was "consistently and uniformly led to believe that his conduct was consistent with the 'official policy' of the United States." Thus, he argues, insofar as equitable estoppel applies to prevent a miscarriage of justice when an individual has been misled by the action or advice of Government officers, it should be applied in this case to prevent his removal.

The respondent cites no case in support of his contention that the Immigration Judge or the Board may apply equitable estoppel in determining whether he is removable under the Act. We agree with the Immigration Judge that equitable estoppel principles do not apply. *See Matter of Hernandez-Puente*, 20 I&N Dec. 335, 338 (BIA 1991) (stating that the Board and the Immigration Judges are without authority to apply equitable estoppel to preclude the Government from pursuing a lawful course of action).

Unlike some provisions of the Act, section 237(a)(4)(D) does not contemplate a balancing of equities in determining whether an alien is removable. There is also no authority for the proposition that a prior grant

---

[10] Our decision in *Matter of Ruiz-Massieu*, 22 I&N Dec. 833 (BIA 1999), did not, as the respondent suggested at oral argument, apply the political question doctrine to removal proceedings within the Executive Branch. Rather, that case concerned a discrete provision in the Act that rendered an alien removable when the Secretary of State determined that his presence in the United States would have potentially harmful foreign policy consequences. *See* former section 241(a)(4)(C)(i) of the Act, 8 U.S.C. § 1251(a)(4)(C)(i) (1994). We concluded that the Secretary's determination is sufficient for a finding that an alien is deportable in those circumstances and that the determination should be "treated as conclusive evidence of the respondent's deportability." *Id.* at 842. Thus, we held only that an Immigration Judge could not review the reasons for the Secretary's determination or otherwise reject it as invalid.

of admission confers immunity from removal. Thus, any consideration of the alien's circumstances is made only by the DHS, in determining whether to file removal charges. *See Matter of Bahta*, 22 I&N Dec. 1381, 1391 (BIA 2000) (explaining that the Government has prosecutorial discretion, including the discretion to address the equities of individual cases in a manner that the rigid application of a broadly drawn statute may not allow).

## III. CONCLUSION

For all the above reasons, we agree with the Immigration Judge's determination that the respondent is removable under section 237(a)(4)(D) of the Act. Because the respondent is also inadmissible under section 212(a)(3)(E)(iii) for participation in acts of torture and extrajudicial killing, we agree with the Immigration Judge that he is ineligible for cancellation of removal pursuant to section 240A(c)(4) of the Act. Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.